IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALFONSO ALFARO,

               Petitioner,               No. CIV S-03-1288 GEB KJM P

     vs.

PEOPLE OF THE STATE OF
CALIFORNIA,

               Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

I. Background

          Pedro Garcia, known to his friends as Peter, celebrated his 20th birthday on February 23, 1996.  Between midnight and 1:00 a.m. he wound up at the home of his cousins Primo and Catalina.  RT 419.[1]  Their brother Alfonso (petitioner) and other family members, including their cousin Joseph (Rene) Rodriguez, were also there.  RT 420-421.  Petitioner was wearing an Adidas jacket and a White Sox hat.  RT 424, 433.[2]

/////

---

[1]  Because several of the witnesses have the same last name, the court will use their first names as a matter of clarity.

[2]  Although petitioner told Detective Catherwood he knew nothing about the shooting, he conceded he owned an Adidas jacket "like the one in the photo."  RT 714.

1    Shortly after arriving, Peter, Rene and petitioner left in Peter's car to steal some

2  beer.  RT 422, 425, 596.  Rene was wearing an Eagles jacket he had borrowed from Peter's

3  brother Henry.  RT 561, 597.  Petitioner suggested they get a gun for protection.  RT 426-427,

4  598.  He was aware that Rene had a gun at his house.  RT 598.

5    They stopped at Rene's house for a few minutes and when Rene got back into the

6  car, he handed a gun to petitioner.  RT 430, 604.  Peter drove to the Quik Stop and parked in

7  back.  RT 431, 605.  Petitioner and Rene got out of the car.  Id.

8    On the evening of February 23-24, 1996, Sukhdev Singh was working as a cashier

9  at the Quik Stop on West Lane in Stockton.  RT 287.  About an hour before the 2:00 a.m. closing

10  time, two men came into the store.  RT 287.  One wore a black jacket with stripes and a hat, the

11  other a jacket with a hood covering part of his face.  RT 288, 608.  The one with the hood went

12  to the beer cooler while the other man stayed at the counter.  RT 289.  Singh asked him for

13  identification before he would sell beer to the men; the man at the counter said they did not have

14  any.  RT 289.  After watching the surveillance video in court, Singh identified the man who had

15  stayed at the counter as the one who shot him and further identified that man as petitioner.  RT

16  296.[3]

17    About five minutes after going into the store, Rene and petitioner ran back to

18  Peter's car.  RT 432.  Rene asked petitioner why he shot the clerk; petitioner said he shot the

19  clerk through the window because he was "looking at him [petitioner] weird."  RT 434, 611, 706.

20  Petitioner gave the gun back to Rene and Peter dropped Rene at his house.  RT 435, 613.  Peter

21  and petitioner returned to Catalina's house.  RT 435.  On the stand, Henry denied petitioner said

22  he shot the clerk because the clerk was on the telephone.  RT 571.  According to Detective

23  Catherwood, however, petitioner told Henry he shot the clerk through the window because

24  petitioner thought the clerk was calling the police.  RT 698.

25  _____

26      [3]  The parties stipulated that the bullet severed an artery outside the heart and went
through Singh's heart, lodging behind it.  RT 282.

1       Rene sold the gun three days after the shooting.  RT 613.

2       At the trial in October 1997, the defense called four witnesses.  Julio Garcia,

3 petitioner's brother, reported that Rene claimed to have shot the clerk after the latter pulled a

4 gun.  RT 819, 821.  Later Julio saw Peter at the mall; Peter reported that Rene ran out of the Quik

5 Stop with the gun in his hand.  RT 823.

6       According to David Martinez, petitioner's nephew and Rene's cousin, Rene said

7 he shot the clerk because he was scared.  RT 907.

8       Petitioner's wife, Mona Alfaro, testified that petitioner was a Raiders fan and had

9 two Raiders starter jackets.  RT 939-940.  He did not own an Adidas jacket.  RT 940.  At the

10 gathering at Catalina's house on February 23, petitioner was wearing green sweats and a white

11 tee shirt.  RT 948.  He got drunk and so Alfaro told Rene and Peter not to take him along to go

12 buy beer.  RT 946.

13       In rebuttal, Rene's brother Edward testified that he was with Rene at Julio's house

14 but did not hear Rene claim to have shot the clerk.  RT 1012.

15       The jury convicted petitioner of premeditated, deliberate attempted murder and

16 found that petitioner personally had used a firearm and inflicted great bodily injury.  CT 632.  It

17 also convicted petitioner of assault with a firearm and possession of a firearm by an ex-felon and

18 found that petitioner had served two prior prison terms.  Id.

19       Petitioner was finally sentenced on May 14, 2001[4] to a total determinate term of

20 fifteen years followed by an indeterminate life term.  RT 1231-1232.

21 II.  Standards Under The AEDPA

22       An application for a writ of habeas corpus by a person in custody under a

23 judgment of a state court can be granted only for violations of the Constitution or laws of the

24 

25      [4] Petitioner did not appear for trial on October 21, 1997 or thereafter.  CT 372.  He was
arrested some time later in New Mexico and convicted of federal drug charges.  RT 1220.

26 Ultimately, he appeared for sentencing in the case underlying this petition on a writ.

United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

claim decided on the merits in state court proceedings unless the state court's adjudication of the

claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

not address the merits of petitioner's Eighth Amendment claim).[5]  Courts are not required to

address the merits of a particular claim, but may simply deny a habeas application on the ground

that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

courts to review state court decisions for error before determining whether relief is precluded by

§ 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

/////

/////

---

[5]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1        The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

2   different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from
> our decisions but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the
> state court's application of clearly established federal law is
> objectively unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

10  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

11  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

12  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

13  (2002).

14        The court will look to the last reasoned state court decision in determining

15  whether the law applied to a particular claim by the state courts was contrary to the law set forth

16  in the cases of the United States Supreme Court or whether an unreasonable application of such

17  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

18  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

19  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

20  must perform an independent review of the record to ascertain whether the state court decision

21  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

22  words, the court assumes the state court applied the correct law, and analyzes whether the

23  decision of the state court was based on an objectively unreasonable application of that law.

24        It is appropriate to look to lower federal court decisions to determine what law has

25  been "clearly established" by the Supreme Court and the reasonableness of a particular

26  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III.  Ineffective Assistance Of Counsel

Petitioner argues that trial counsel was ineffective because he was not prepared and failed to cross-examine several witnesses, challenge some evidence or present a closing argument.  In addition, he argues that counsel's intemperate behavior rendered his performance constitutionally ineffective.

The federal law on claims of attorney ineffectiveness is clear:

First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688.  A court must "indulge a strong presumption" that counsel's conduct falls within the range of competence.  Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986).  Accordingly, this court must determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance and a petitioner must overcome the presumption that the act or omission might be an appropriate strategic decision.  Id. at 689, 690.

It also is petitioner's burden to establish prejudice:  "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  This evaluation must be based on the totality of the evidence before the jury, recognizing the probability of a different outcome is less likely in a case "with overwhelming record support." Id. at 695, 696.  Moreover, a court may address prejudice without first determining whether counsel's performance was deficient. Id. at 697.

/////

6

A.  <u>Behavior</u>

Problems with trial counsel, Richard Hawk, appear to have begun during the prosecutor's opening statement, as he prepared to show the jury a portion of the videotape from the convenience store.  Counsel told the court that the video was not the one the court watched during the in limine motions and said he himself had not seen it.  Deputy District Attorney Gregory Furey objected to Hawk's representations.  Hawk's reply -- "I don't care what you object to.  I will say what I want to" -- elicited this from the trial judge:

> This case is going to end up being a dog fight.  I understand that.
> Which is fine, that's no problem. . . . .

RT 195.

During Hawk's cross-examination of the evidence technician who collected evidence from the crime scene, the court scolded Hawk for berating the witness and forbade him from insinuating that the witness "did something stupid" as she processed the crime scene.  RT 262.  When Furey asked Officer Egan if he was tired after working the graveyard shift, Hawk objected because he did not understand "the relevance of that, other than a snivel."  RT 337.  When Egan identified the original videotape he had collected from the Quik Stop, Hawk complained that the original was of better quality than the copy which had been given to him and chided the judge, "This is not the way you are supposed to do things, Judge."  RT 348.  When the parties squabbled over showing the portion of the video showing Egan coming into the Quik Stop, Hawk continued to talk while the judge was questioning the prosecutor, prompting the judge to snap, "Will you be still, dammit?  Be still."  RT 352.

Petitioner's absence did not temper  Hawk's tactics.  As the prosecutor attempted to ask Peter about the beer run, Hawk made several objections and then complained, "We have rules he's not abiding by."  This prompted the court to tell the parties to identify the legal basis for any objection without argument.  RT 423.  Hawk later objected that a witness was "mumbling and sniveling," which comment the court labeled "inappropriate."  RT 440-441.

1      Out of the jury's presence, Hawk called Peter Garcia a "snitch, a rat, and not much

2 of a man" and a "sack of shit." RT 447, 454, 471. In the jury's presence, Hawk called Peter a

3 "son of a bitch." RT 469. The court admonished Hawk for attempting to intimidate the witness.

4 RT 472.

5      Later, the court told Hawk to ask only proper questions and to refrain from

6 arguing his case with his questions. RT 545. Nevertheless, when the prosecutor asked Peter

7 about threats from petitioner's family, Hawk said "There is no limit to these guys. There is no

8 class." RT 552.

9      Hawk also violated the court's order not to ask Rene about his testimony in a prior

10 murder case. RT 667. When he asked David Martinez whether Rene carried a gun because he

11 was selling drugs, the court deemed the tactic "an outrage" and struck the question. RT 915.

12      Outside the presence of the jury, Hawk insisted that petitioner's wife Mona be

13 told she had the right to consult counsel before she answered questions about petitioner's

14 whereabouts. The court said it was "getting up to the eyeballs with some of your tactics, really,

15 it's sad to see you here." RT 999. Later, the court told Hawk to "zip up" because he was

16 "dangerously . . . close to being held in contempt," after Hawk attempted to cross-examine

17 Edward Rodriguez about his criminal record. RT 1023.

18      Finally, during the prosecutor's closing argument, Hawk interrupted the

19 prosecutor's story about one of his criminal law professors, which again prompted the court to

20 ask Hawk to make only proper objections. RT 1121.

21      The Court of Appeal rejected petitioner's contention that Hawk's behavior denied

22 him his right to a fair trial:

23    [W]hile defendant argues that his counsel "was obnoxious and
offensive, making an awful impression with the jury on behalf of
24    his client," he has not shown that trial counsel's offensive conduct
affected the outcome of the trial. First, the conduct that occurred
25    outside the jury's presence could not have affected its verdict.
Second, calling a prosecution witness a snitch, trying to refer to a
26    prejudicial excluded matter in front of the jury, and disrupting the

prosecution's closing argument, although improper, were probably
more prejudicial to the prosecution's case than to the defense.
Third, judicial admonitions, where justified, cannot be deemed to
establish prejudice without unduly restricting the trial court's
ability to control its courtroom.  Only the *conduct that provoked
the admonitions* can establish prejudice, and as we have noted,
defendant has not shown that trial counsel's offensive conduct
affected the outcome of the trial. . . .

In short, defendant has not shown a reasonable probability that, but
for his trial counsel's aggressive or argumentative advocacy, the
result of this trial would have been different, particularly given
defendant's failure to appear on and after the second day of trial.

Answer, Ex. C at 45-46.

The Court of Appeal did not apply federal law unreasonably.  As the federal
courts have recognized, the standard against which to measure trial counsel's conduct, whether
described as "persistent [and] combative" "outrageous," "abusive and argumentative," or "rude
and hostile," is the familiar <u>Strickland</u> standard.  <u>Mickens v. United States</u>, 53 F.Supp.2d 326,
330, 331 (E.D.N.Y. 1999); <u>Mason v. Mitchell</u>, 320 F.3d 604, 618 (6th Cir. 2003); <u>Davis v.
Woodford</u>, 384 F.3d 628, 650-51 (9th Cir. 2004), <u>cert. dismissed sub nom. Davis v. Brown</u>, __
U.S. __, 126 S.Ct. 410 (2005).   In this case, the Court of Appeal did not determine whether
Hawk's actions were outside the range of professionally competent behavior, but instead focused
on the impact of these actions on petitioner's trial, a proper approach under Supreme Court
authority.  <u>Strickland</u>, 466 U.S. at 697.

The Court of Appeal's determination that Hawk's behavior did not prejudice the
defense is not unreasonable.  The evidence against petitioner was strong: he suggested that the
group get a gun for "protection" during the beer run, RT 427; he carried the gun into the
convenience store, RT 430; the victim identified him as the shooter, RT 296; he told various
people that he shot Singh because the clerk had been "looking at him weird" or had picked up the
telephone.  RT 430, 698.  Finally, as the Court of Appeal noted, petitioner's own conduct, in his
failure to return to court after Singh identified him, only underscored the strength of the evidence
against him.  Although deplorable, the tenor of Hawk's performance did not harm the defense in

9

1  this case in a constitutionally significant manner.

2      B. Specific Actions

3      On October 21, 1997, while the prosecutor was still presenting his case, petitioner

4  did not appear for trial.  RT 372.  Court was adjourned that day without further proceedings

5  because a juror was ill.  RT 375.  Petitioner also did not appear the next day; Hawk said he "[did

6  not] know how to proceed without him."  RT 379.  He also noted that he did not "prepare the

7  case three or four months in advance" but rather formulated his cross-examination based on the

8  dynamics of trial.  RT 385.  Petitioner's absence, he claimed, would hobble his ability to cross-

9  examine the witnesses effectively.  RT 385.  Hawk said he "could make things worse for him by

10  asking questions I don't know the answer to, that he would know the answer. . . ."  RT 390.  He

11  predicted he would ask "little or no questions" throughout the rest of the case.  RT 397.  In fact,

12  he did not cross-examine two of the five remaining prosecution witnesses -- Henry Garcia or Dr.

13  Overton, who treated Singh in the emergency room.  See RT 572, 783.

14      Hawk did not present closing argument, deciding instead "to rely upon the state of

15  the evidence and the state of that argument."  RT 1128.

16      On appeal, petitioner argued that Hawk's acts and omissions constituted

17  ineffective assistance of counsel.  The Court of Appeal rejected these claims, relying in part on

18  Strickland v. Washington, 466 U.S. 668 (1984).

19      1.  Failure to Cross-examine.  Defendant suggests that he was
    prejudiced by trial counsel's refusal to cross-examine prosecution
20   witnesses, in that "[c]ounsel asked no questions on cross-
    examination of Henry Garcia.  The same was true for Dr. Overton.

21

22   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

23   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

24   The only prosecution witnesses who were *not* cross-examined by
    defense counsel were (1) Henry Garcia and (2) Dr. John Overton.
    But Henry Garcia testified beneficially to defendant: He *denied*
25   that he had reported to Detective Catherwood that defendant
    admitted the crime . . . .  And the doctor's testimony was brief and
26   not particularly prejudicial to defendant. . . .  Indeed, the defense

had attempted to eliminate Dr. Overton's testimony in its entirety by stipulation.

There were good tactical reasons to allow the testimony of both witnesses to pass unchallenged:  Henry's testimony under direct examination was beneficial to defendant, and there was little to be gained from challenging the doctor. . . .

. . . [T]he benefit and prospect of impeaching Henry Garcia's statements in light of his favorable testimony at trial denying defendant's admission is surely a judgment call that cannot be deemed ineffective assistance of counsel.

We cannot say that defendant's representation fell below an objective standard of reasonableness, or that defendant was prejudiced, by his counsel's decision not to cross-examine these two witnesses.

2.  Decision To Forgo Closing Argument. . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The right to present closing argument to the jury in a criminal case is an element of the right to counsel.

But "[c]losing argument may be waived in an appropriate case as a matter of tactics."  If trial counsel's omissions stemmed from "'an informed tactical choice within the range of reasonable competence,'" the omission provides no basis for reversing a defendant's conviction.  Moreover, we must be "highly deferential" to the tactical decisions made by counsel. . . .

The record suggests that counsel had tactical grounds for not making a closing argument [fn].

> [fn] Moreover we note that defense counsel was not entirely silent.  Rather, he stated his intention to "rely upon the state of the evidence and the state of [the prosecution's closing] argument."  That statement effectively communicated that the prosecution had not proven its case against defendant.

First, immediately after the case went to the jury, the prosecution reported to the trial court that defense counsel had revealed that his reason for waiving argument "ha[d] to do with him intentionally building in error."  Defense counsel did not deny it, possibly considering that any benefit from closing argument was outweighed by the benefit of creating a claim for ineffective assistance of counsel. [fn. omitted].

Second, the prosecution did not argue . . . that the defendant could

be found guilty on a theory that the shooting was a natural and probable consequence of the burglary – a theory of liability that could have made the identity of the shooter largely irrelevant. When defense counsel declined closing argument, the prosecution was foreclosed from offering any rebuttal in which to argue a theory of vicarious liability.  The trial court acknowledged this strategy was a sound one. . . .

The goal of depriving the prosecution of rebuttal argument is a legitimate tactical basis for the decision to forgo closing argument. Because defense counsel's decision to forgo closing argument apparently resulted from "'an informed tactical choice'" that a reasonably competent attorney might make, his decision cannot serve as a ground for reversing defendant's conviction on appeal.

Answer, Ex. C at 35-41 (internal citations omitted; emphasis in original).

Whether to cross-examine a particular witness is a tactical decision left to counsel, which this court must view with great deference.  Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000).

It is not [] always the best trial strategy to exploit every inconsistency in the statements of a witness, even a witness called by opposing counsel.

Cannon v. Mullin, 383 F.3d 1152, 1164 (10th Cir. 2004), cert. denied, 544 U.S. 928 (2005).  To succeed on such a claim, a habeas petitioner should suggest how counsel should have proceeded. Cf. Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997).

Petitioner has not met his burden, for he neither has overcome the presumption that the decision not to cross-examine these two witnesses was "sound trial strategy," Strickland, 466 U.S. at 689, nor suggested how Hawk could have helped the defense by cross-examining the physician who treated Singh or Henry Garcia, who denied he had told police anything about petitioner's motive for shooting Singh.

Hawk proffered a tactical reason for his decision to forgo closing argument: he said he would not argue but instead would rest on the state of the evidence.  RT 1128.  A decision to waive closing argument may be a reasonable tactical decision.  Bell v. Cone, 535 U.S. 685, 701-02 (2002).  Petitioner's brief argument that "the importance of closing argument cannot

1   be overstated" and, that by waiving argument, counsel forfeited the ability to discuss "important

2   concepts" such as premeditation, does not overcome the presumption that Hawk's decision was a

3   reasonable tactical choice.  Accordingly, petitioner has not shown that the state Court of Appeal

4   applied <u>Strickland</u> and <u>Bell</u> unreasonably in rejecting this claim of error.

5   IV.  <u>Sufficiency Of The Evidence And Instructions On Aiding And Abetting</u>

6             In this case the jury was instructed it could find petitioner guilty of the charged

7   crimes if it found he aided and abetted a commercial burglary.  CT 219-222.  Petitioner argues

8   that the evidence was insufficient to show that the shooting was a natural and probable

9   consequence of the attempted burglary and that one of the instructions on this subject was

10   misleading.  Respondent argues that the claim is not exhausted, because it was not included in

11   the petition for review state appellate counsel filed in the California Supreme Court.  Answer at

12   22-23.

13             The exhaustion of state court remedies is a prerequisite to the granting of a

14   petition for writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  A petitioner satisfies the exhaustion

15   requirement by providing the highest state court with a full and fair opportunity to consider all

16   claims before presenting them to the federal court.  <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971);

17   <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1086 (9th Cir. 1985).  The petition for review in this case

18   contained only two claims: the conduct of counsel violated petitioner's constitutional rights and

19   the evidence was not sufficient to show that the attempted murder was willful, deliberate and

20   premeditated.  Answer, Ex. D (Petition for Review).

21             Nevertheless, the court may address petitioner's claims "when it is perfectly clear

22   that the petitioner has no chance of obtaining relief."  <u>Cassett v. Stewart</u>, 406 F.3d 614, 624 (9th

23   Cir. 2005), <u>cert. denied sub nom. Schriro v. Cassett</u>, ___ U.S. ___, 126 S.Ct. 1336 (2006).  Having

24   considered the petition and its exhibits, the answer, reply and state court record, this court finds

25   the <u>Cassett</u> standard has been satisfied.

26   /////

The Court of Appeal rejected these claims on appeal:

Here, there was arguably insufficient evidence to support a conviction of attempted murder based on defendant's aiding and abetting the shooter or of the shooting being the natural and probable consequence of a burglary.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Even assuming that there was insufficient evidence upon which to base an aiding and abetting theory, the record here affirmatively demonstrates that the jury did *not* rest defendant's attempted first degree murder verdict on a theory of vicarious liability based on aiding and abetting.  Rather, it relied upon the prosecution's chief theory, i.e., that defendant was directly liable for attempted murder and assault because he, not Rene, shot Singh: The jury found true allegations that defendant *personally* used a firearm in the course of his attempted commission of the willful, deliberate, and premeditated murder of Singh, and that defendant personally inflicted great bodily injury on Singh in the course of attempting to murder him.

Having found defendant *personally* used the firearm in the attempted murder of Singh, the jury could not have relied upon a theory that defendant was merely vicariously liable for the actions of a co-participant.  Nor could defendant intend to inflict great bodily injury on Singh if he only intended to aid a burglary, which merely had the natural and probable consequence of an attempted murder.  It is thus of no consequence that a theory that the jury plainly rejected was not supported by the facts.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant also takes issue with that portion of CALJIC No. 8.67 which . . . [d]efendant contends . . . is "misleading" in light of the California Supreme Court's holding *People v. McCoy* (2001) 25 Cal.4th 1111, . . .

Even assuming for argument's sake that defendant is correct that the instruction could be improperly construed to suggest that an aider and abettor could be vicariously liable for the perpetrator's intent, there is no basis for reversal. . . . [W]e affirm the judgment even when the prosecution presents its case on alternate theories, some of which are legally correct and others legally incorrect . . . if there is "a basis in the record to find that the verdict was actually based on a valid ground.

/////

/////

/////

14

> Here, as we explained, the jury's special findings that defendant
> personally used a gun in the crimes and intentionally inflicted great
> bodily injury on Singh plainly shows that the jury rested its verdict
> on the legally and factually supported theory that defendant
> intentionally shot Singh in an effort to kill him.

Answer, Ex. C at 24-27 (some citations omitted; emphases in original).

### A.  Sufficiency Of The Evidence Of Aiding And Abetting

The Court of Appeal's concession that the evidence of aiding and abetting was "arguably insufficient" does not entitle petitioner to federal habeas relief.  In Griffin v. United States, 502 U.S. 46, 47-48 (1991), the defendant was charged with a conspiracy, which had two objects:  impairing the efforts of the IRS to ascertain taxes and the efforts of the DEA to find forfeitable assets.  Although the government conceded there was no evidence that defendant was involved in hiding forfeitable assests from DEA, the jury was instructed on both objects of the conspiracy and returned a general verdict of guilty.  The Supreme Court rejected the defendant's Fifth Amendment due process challenge to her conviction, finding that when one of the possible bases of conviction is not supported by sufficient evidence, the conviction is not thereby invalidated, because "juries *are* well equipped to analyze the evidence."  Id. at 56, 59 (emphasis in original).  In this case, the jury was given the option of convicting petitioner of attempted murder as an aider and abettor or as the direct perpetrator; that the evidence may have been insufficient on the aiding and abetting theory does not render his conviction constitutionally invalid.

### B.  Instruction On Aiding And Abetting

Petitioner claims that the instructions on the aiding and abetting theory were misleading.  When a verdict may be based on a legally, as opposed to factually inadequate, theory, the conviction may be constitutionally unsound.  Yates v. United States, 354 U.S. 298, 298, 311-12 (1957).  However, as the Ninth Circuit has recognized, any error in submitting a charge to a jury on a legally inadequate theory is harmless if it can "determine with 'absolute certainty' that the jury convicted under the proper theory."  Lara v. Ryan, 455 F.3d 1080 (9th Cir.

2006); see Ficklin v. Hatcher, 177 F.3d 1147, 1151 (9th Cir. 1999).  In Lara, the court considered

whether an attempted murder conviction was invalid when the jury was instructed on express

malice, which was proper, and implied malice, which was not.  Lara, 455 F.3d at 1083.  It found

that the jury's determination that the attempted murder was willful, deliberate and premeditated

meant that it had found Lara had acted with express malice.  Id. at 6.

    The instant case is similar: in California, an aider and abettor may be liable for

another's action if he shares the perpetrator's intent, even though he does not perform the same

actions.  See People v. Beeman, 35 Cal.3d 547, 599 (1984).  In this case, however, the jury found

that petitioner personally used a firearm and personally inflicted great bodily injury on Singh.

CT 468-469 (verdict forms); RT 1159 (verdict as read).  These findings of personal use and

personal infliction show that the jury found petitioner was the direct perpetrator, not an aider and

abettor, of the attempted murder.  The Court of Appeal's reliance on these findings to determine

any error to be harmless was not an unreasonable application of clearly established federal law,

for these findings allow this court also to be "absolute[ly] certain" that the jury convicted on the

correct theory.

V.  Sufficiency Of Evidence That Crime Was Premeditated And Deliberate

    On appeal, petitioner argued that "[t]his was a sudden, surprise shooting, but not a

premeditated attempt to kill." Answer, Ex. B at 55 (opening brief).

    The Court of Appeal rejected this argument:

> That is certainly one interpretation of the evidence, but it is not the
> only one.  To the contrary, defendant's repeated requests for a gun
> in preparation for the "beer run," the fact that defendant believed
> (according to Henry Garcia's interview) that Singh was picking up
> the phone to call the police before defendant shot him, and the fact
> that the defendant shot at him five times at close range, one shot
> nearly hitting a bull's-eye, support the jury's finding that the
> defendant had planned with deliberation and premeditation to
> shoot anyone who impeded his "beer run."
>
> In arguing that the evidence was insufficient, defendant relies upon
> the oft-cited test found in People v. Anderson (1968) 70 Cal.2d 15,
> 26-27 (Anderson), which sets forth three categories of evidence for

a reviewing court to consider in evaluating proof of premeditation and deliberation: facts related to (1) the defendant's planning activity prior to the killing; (2) his motive to kill, derived from his prior relationship or conduct with the victim; and (3) the manner of killing, indicating some preconceived design to kill in a certain way.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . [T]he California Supreme Court has applied the *Anderson* factors to facts very similar to those before us and has found sufficient evidence to justify the jury's finding of premeditation and deliberation. (*People v. Miranda* (1987) 44 Cal.3d. 57, 89 (*Miranda*), disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)  In *Miranda*, the defendant shot a convenience store clerk who had refused several requests to sell him beer because it was after 2:00 a.m. (*Miranda*, at pp. 71, 74.) The defendant testified that after the clerk rudely rebuffed his attempts, he pulled out a gun and demanded money. (*Id*. at pp. 71-72, 74.)  A second clerk responded "okay," but the defendant shot him immediately anyway. (*Id*. at pp. 71-72.)  The second clerk died as a result of the shooting. (*Id*. at p. 72.)  The defendant then shot the first clerk and fled from the store *without* taking any cash. (*Id*. at pp. 72, 74.)

The Supreme Court in *Miranda* applied the tripartite *Anderson* test and found that there was sufficient evidence of premeditation and deliberation to support a verdict of first degree murder.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In light of the reasoning and result in *Miranda*, we likewise conclude that there *was* evidence in this case of a motive to kill, coupled with evidence of planning activity, sufficient to permit a reasonable jury to find that defendant's actions were premeditated and deliberate. . .  As in *Miranda*, there was evidence here that defendant was annoyed or angered by the victim: Pedro overheard defendant say he shot Singh "'[b]ecause he was looking at him weird," and there was evidence defendant told his cousin Henry that Singh was shot while he "was on the phone to the police department."  From this, the jury could reasonably have inferred that defendant feared Singh was "looking at him" to make a mental note of his appearance in order to report him to the police.  While defendant's failure to take anything might have made an arrest and prosecution difficult, the law does not require that a murderer have a flawless motive for an attempted killing, as noted in *Miranda*, *supra*, 44 Cal.3d at page 87.  Thus, there was evidence from which

1    to infer a motive to shoot Singh.

2        In addition, there was also evidence of planning by reason of "the
     fact that defendant brought [a] loaded gun into the store and shortly
3        thereafter used it to [shoot] an unarmed victim [, which] reasonably
     suggests that defendant considered the possibility of murder in
4        advance." (*Miranda*, *supra*, 44 Cal.3d at p. 87.)  That defendant
     asked for a gun several times "for protection" before the three
5        attempted their "beer run" also suggests that defendant was
     prepared to shoot anyone who impeded their beer run or their
6        escape.  The videotape of the shooting shows that defendant kept
     his right hand in his pocket while he paced in front of [the] counter
7        and spoke with Singh.  The jury could reasonably have inferred
     that defendant had the gun in his hand and was prepared to shoot
8        during his entire exchange with the victim.  This, too, reflects
     planning.  The jury might also have inferred that by waiting to
9        shoot Singh until after he left the store, defendant had additional
     moments to reflect on whether shooting Singh would prevent him
10       from identifying defendant to the police.

11       Finally – and like the defendant in *Miranda*–shooting an unarmed
     cashier who has offered neither physical provocation nor threat
12       "leads to an inference that an attack was the result of a deliberate
     plan rather than a 'rash explosion of violence." . . .

13
     . . . . [T]he evidence . . . supported a finding that defendant planned
14       to kill anyone at the store who impeded his efforts or risked his
     arrest.  Defendant did not need to know the identity of the cashier
15       to know that there would be a cashier.  And when Singh sought to
     inform the police about defendant, defendant simply executed his
16       plan.

17       . . . [T]here was no evidence of any provocation that would have
     elicited a shooting in anger.  The jury could reasonably have
18       concluded that the only act that elicited the shooting was Singh's
     picking up the phone to call the police – an act that would provoke
19       a plan to stop the call, that is, to kill the caller.  Further, the well
     targeted shot – it entered the pericardium (the sac that surrounds
20       the heart) – evidenced a design, rather than a fortuity.

21   Answer, Ex. C at 10-17.

22       In Jackson v. Virginia, the Supreme Court examined the role of a habeas court in

23   /////

24   /////

25   /////

26   /////

18

considering a challenge to the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 319 (1979) (emphasis in original).

The Court continued:

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

Id. at 326.  Constitutionally sufficient evidence need not rule out every hypothesis except that of guilt.  Id.  This court must apply the Jackson standard with "explicit reference to the substantive elements of the criminal offense as defined by state law."  Id. at 324 & n.16.  Moreover, this court must apply Jackson with an extra layer of deference to the state court's determination, as mandated by the AEDPA.  Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005), cert. denied, __ U.S. __, 126 S.Ct. 1142, 1145 (2006).

In California, courts consider several factors in determining whether a murder or an attempted murder has been committed with premeditation and deliberation:

> [I]n order for a killing with malice aforethought to be first rather than second degree murder, "[t]he intent to kill must be ... formed upon a *pre-existing* reflection," ... [and have] been the subject of actual deliberation or *forethought* ...'  The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing--what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than 'mere unconsidered or rash impulse hastily executed' (People v. Thomas, supra, 25 Cal.2d 880, at pp.

19

898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).

Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).

People v. Anderson, 70 Cal. 2d 15, 26-27 (1968).  While these factors do not establish a rigid framework, they are a long-used guide to appellate consideration of the sufficiency of the evidence.  See, e.g., People v. Perez, 2 Cal. 4th 1117, 1124 (1992).

The Court of Appeal's reliance on the Anderson factors to find the evidence sufficient in this case was not an unreasonable application of Jackson.  Nor did the state appellate court unreasonably find the facts supporting the Anderson factors.  As it noted, petitioner sought a gun for "protection" during the proposed beer run, from which a rational juror could infer Anderson's planning activity.  RT 426.  Moreover, petitioner told people that he shot Singh because the cashier was looking at him "weird," RT 434, and because the cashier was on the telephone to the police department.  RT 698.  A rational juror could interpret these statements as showing motive for the shooting.  Finally, petitioner shot the unarmed Singh in the chest without any provocation from the cashier, from which a rational juror could infer that the "attack was the result of a deliberate plan rather than a 'rash explosion of violence.'"  People v. Miranda, 44 Cal.3d 57, 87 (1987); RT 296.  The Court of Appeal did not unreasonably apply clearly established federal law.

VI.   Instruction On Eyewitness Identification

Petitioner argues that the trial court's failure to instruct the jury on the factors for evaluating eyewitness testimony deprived him of a fair trial or, in the alternative, that counsel

was ineffective for failing to request that the instruction be given.[6]  Respondent counters that this claim is not exhausted.

As noted above, the claim was not included in petitioner's state petition for review.  Even so, the court may reach the merits of the claim.  <u>Cassett</u>, 406 F.3d at 624.

/////

---

[6]  The instruction, CALJIC No. 2.92, provides in relevant part:

Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime[s] charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including, but not limited to, any of the following:

[The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;]

[The stress, if any, to which the witness was subjected at the time of the observation;]

[The witness's ability, following the observation, to provide a description of the perpetrator of the act;]

[The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;]

[The cross-racial [or ethnic] nature of the identification;]

[The witness's capacity to make an identification;]

[Evidence relating to the witness's ability to identify other alleged perpetrators of the criminal act;]

[Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;]

[The period of time between the alleged criminal act and the witness's identification;]

[Whether the witness had prior contacts with the alleged perpetrator;]

[The extent to which the witness is either certain or uncertain of the identification;]

[Whether the witness' identification is in fact the product of [his][her] own recollection;] and

Any other evidence relating to the witness' ability to make an identification.

1    The state Court of Appeal rejected this challenge:

2    Defendant's failure to request the instruction waives his right to
     have it given.  "CALJIC No. 2.92 or a comparable instruction
3    should be given *when requested* in a case in which identification is
     a crucial issue *and* there is no substantial corroborative evidence. . .
4    "No case has imposed a sua sponte duty to instruct the jury on
     CALJIC No. 2.92."
5
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
6
     [D]efendant also asserts . . . that his counsel's failure to request the
7    instruction constituted ineffective assistance of counsel.  But
     where, as here, the jury has been admonished with other
8    instructions relating to the assessment of witness credibility and the
     application of the correct burden of proof . . . those instructions are
9    deemed "sufficient to inform the jury that the prosecution had the
     burden of establishing identity, and that defendant should be
10   acquitted in the event the jury harbored a reasonable doubt on the
     issue of identity." . . . . Thus, the failure to instruct with CALJIC
11   No. 2.92 was not prejudicial, even assuming that it was ineffective
     assistance of counsel not to request the instruction.
12
13   Answer, Ex. C at 28-30.

14          Claims of error in state jury instructions are generally matters of state law that do

15   not raise constitutional questions unless they amount to a deprivation of due process.  Hayes v.

16   Woodford , 301 F.3d 1054, 1086 (9th Cir. 2002).

17          Several courts have found no constitutional error when an instruction on

18   eyewitness identification has been refused or omitted.  Eberhardt v. Bordenkircher, 605 F.2d 275,

19   277 n.1 (6th Cir. 1979) (refusal to give eyewitness instruction not a due process violation); Love

20   v. Young, 781 F.2d 1307, 1319 (7th Cir. 1986) (no error in refusing eyewitness instruction when

21   victim had opportunity to view assailant); Jones v. Smith, 772 F.2d 668, 672 (11th Cir. 1985) (no

22   need to instruct on eyewitness identification when jury was instructed on reasonable doubt);

23   Cotton v. Armontrout, 784 F. 2d 320, 322 (8th Cir. 1986) (omission of eyewitness instruction not

24   error when other instructions covered state's burden and credibility of witnesses).

25   /////

26   /////

1   The jury in this case was instructed that:

2   The burden is on the People to prove beyond a reasonable doubt
    that the defendant is the person who committed the crime with
3   which he is charged.

4   If, after considering the circumstances of the identification and any
    other evidence in this case, you have a reasonable doubt whether
5   defendant was the person who committed the crime, you must give
    the defendant the benefit of that doubt and find him not guilty.

6
    Assuming you do not find the Defendant guilty of a crime because
7   of and on the theory of aiding and abetting an alleged crime of
    burglary, and you have a reasonable doubt who shot the victim in
8   this case, you should find the Defendant not guilty.

9   CT 218; RT 1080.  The court also instructed the jury on the factors for evaluating the credibility

10  of witnesses, which included "the extent of the opportunity or the ability of the witness to see or

11  hear or otherwise become aware of any matter about which the witness has testified."  CT 186;

12  RT 149.[7]  There was no error.

13          Similarly, defense counsel Hawk was not ineffective in failing to request that the

14  eyewitness instruction be given: "Because, under the circumstances, the jury instructions were

15  not improper, the failure of Petitioner's trial counsel to object or request an additional instruction

16  was not objectively unreasonable."  Aparicio v. Artuz, 269 F.3d 78, 100 (2d Cir. 2001).

17          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

18  writ of habeas corpus be denied

19          These findings and recommendations are submitted to the United States District

20  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

21  days after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24  shall be served and filed within ten days after service of the objections.  The parties are advised

25

26          [7]  This instruction was given at the beginning of the trial, just after the jurors were sworn.

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 29, 2006.

UNITED STATES MAGISTRATE JUDGE

2/alfa1288.157